Argued and submitted December 19, 2013, affirmed July 16, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GARY DEAN CLINE,
*Defendant-Appellant.*

Coos County Circuit Court
11CR0891; A150318

330 P3d 1255

Alice Newlin-Cushing, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

Defendant appeals a judgment of conviction for one count of unlawful possession of marijuana, ORS 475.864. He assigns error to the trial court's denial of his motion to suppress evidence that was obtained during his encounter with a North Bend police officer. He contends that he was unlawfully seized in the course of that encounter and that the evidence acquired as a result of that seizure should have been suppressed. We review the denial of that motion for errors of law, deferring to the trial court's factual findings when there is evidence in the record to support them, *State v. Hampton*, 247 Or App 147, 149, 268 P3d 711 (2011), *rev den*, 352 Or 107 (2012), and affirm.

At around ten-past midnight, Officer Dunning of the North Bend Police Department drove his patrol car past defendant, who was walking down the street carrying a "sea bag." After attending to some other business, Dunning caught up with defendant down the road. Dunning pulled up alongside defendant and rolled down his window to talk with him.[1] By defendant's reckoning, Dunning's car was two or three steps from the curb where defendant was standing. The two had spoken many times before. Dunning began by saying something like, "What are you doing tonight?" or, "How's it going tonight?" Early in the course of the conversation, defendant began to approach Dunning's cruiser. When defendant began to approach, Dunning told defendant something to the effect of, "stay where you are" or, "stay there."[2] Dunning then got out of his cruiser and came to the

---

[1] At the hearing on the motion to suppress, Dunning testified, "I pulled up next to him." During his testimony, defendant stated that Dunning pulled up "directly in front of me," at a time that "I was getting ready to cross." Although the trial court did not make findings on the point, we are required here to assume that it found the facts in a manner consistent with its ultimate conclusion that defendant was not seized—*i.e.*, that Dunning pulled up alongside defendant, rather than imposing his cruiser upon defendant's line of travel. *See State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993) ("If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion.").

[2] Defendant testified, alternatively, that Dunning had told him "stay right there" or, alternatively, "stay on the curb." In making its findings, the trial court found that Dunning said, "'Stay where you are,' or something of that nature." The court also stated that, "in some context, the police officer told him to stay on the curb as they were having their conversation." In the context of this encounter,

sidewalk to talk with defendant. In the course of what defendant described as "the initial casual talk that we always have," defendant told Dunning that he had been out collecting cans, an activity that Dunning knew that defendant engaged in with some regularity. Dunning asked defendant what was in the sea bag. Defendant replied that it held cans and put the bag on the ground, in an apparent attempt to make noise with the cans to audibly demonstrate the bag's contents. Dunning asked to look inside the bag. Defendant replied, "'Sure, why not?'" and partially opened it up. Dunning observed a black garbage bag inside. Dunning asked what was inside the garbage bag; defendant told him that it held more garbage bags. Dunning then asked if he could look inside the garbage bag. Defendant partially opened it, and at that point Dunning smelled marijuana and observed plant material. According to Dunning, defendant then said, "It's marijuana," and "I'm going to jail."

Defendant was charged with unlawful possession of marijuana, ORS 475.864. He moved before trial to suppress all evidence that was obtained as a result of the encounter with Dunning, which, he contended, amounted to an unlawful seizure of his person by Dunning in violation of Article I, section 9, of the Oregon Constitution.[3] After a hearing, the trial court denied defendant's motion and made the following finding: "I draw a lot about the tenor of the conversation from the words that the Defendant used in describing it. I mean, it seems to me that the Defendant pretty much indicated that it was kind of what the police officer said—a conversation in the middle of the night with somebody you know."

Defendant challenges the denial of that motion, contending that he was unlawfully seized by the time that Dunning detected the presence of marijuana in his bags. The state responds that defendant was not seized—and thus not seized unlawfully—at that time.

---

as relevant to our analysis below, we discern no meaningful distinction between those directives.

[3] Article I, section 9, provides, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

Article I, section 9, protects individuals against unreasonable searches and seizures. Under that section, a "seizure" occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis and footnote omitted). "[T]he crucial question in determining if a mere encounter has become a constitutionally significant seizure is whether, by word or deed, a law enforcement authority has manifested 'a show of authority' that restricts a person's 'freedom of movement.'" *State v. Radtke*, 242 Or App 234, 239, 255 P3d 543 (2011). The fact that an officer has conveyed his or her official status to a defendant is not a "show of authority"; instead,

> "[w]hat is required is a reasonable perception that an officer is exercising his or her official authority to restrain. Explicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs. Necessarily, then, the fact that an individual—for reasons personal to that individual—feels obliged to cooperate with the officer simply because of the officer's status is not the form or source of coercion that is of constitutional concern."

*State v. Backstrand*, 354 Or 392, 401-02, 313 P3d 1084 (2013). The seizure analysis under Article I, section 9, is a "fact-specific inquiry into the totality of the circumstances of the particular case." *State v. Ehly*, 317 Or 66, 78, 854 P2d 421 (1993). A public encounter does not amount to a seizure "merely because the encounter may involve inconvenience or annoyance for the citizen." *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991).

Defendant's argument that he was seized consists of two primary thrusts. First, he points to the fact that Dunning told him to stay on the curb, and contends that the direction from Dunning constituted a show of authority sufficient to effectuate a seizure of his person. Second, he argues that the totality of Dunning's conduct throughout the encounter up until the point that the marijuana was

discovered—including questioning him about the contents of his bags and requesting consent to inspect those bags— would lead a reasonable person in defendant's position to believe that defendant was the subject of an ongoing investigation, and, thus, that Dunning was intentionally and significantly restraining defendant's liberty or freedom of movement.

We first examine whether defendant was seized by Dunning's direction to stay on the curb. In support of his argument on that point, defendant relies on *State v. Johnson*, 105 Or App 587, 805 P2d 747 (1991), and *State v. Zaccone*, 245 Or App 560, 261 P3d 1287 (2011). In *Johnson*, three police officers arrived at the parking lot of an apartment in response to a report of a fight. The officers saw the defendant walking on a path behind a chest-high bush with his hand in his pocket. One of them told the defendant that he was investigating a fight and asked whether the defendant knew anything about it. The defendant replied that he did not. The officer told the defendant that he could not see him very well and asked him what he had in his pocket; the defendant said, "Nothing," and put both his hands in the air. The officer then said, "I can't see you back there, can you step out [from behind the bush]"? *Johnson*, 105 Or App at 589 (brackets in original). The defendant changed his course and walked about 15 feet toward the officer. One of the questions on appeal was whether the officer had seized the defendant by asking him to come out from behind the bush. We concluded that he had, stating that the officer's request was a show of authority that "converted the conversation into a stop." *Id.* at 591.

In *Zaccone*, the defendant was a passenger in a car that had been stopped for a traffic violation. The officer asked all the occupants for their identifications; the defendant replied that he did not have any, but, in response to the officer's additional requests, supplied a name and a date of birth. The officer believed that the information was false. A second officer arrived. The second officer approached and asked the defendant to step out of the car because it was going to be towed. The second officer then saw the defendant's wallet and asked if he might have a look at it. The defendant agreed and stated that he had initially provided

a false name out of fear that he had an outstanding arrest warrant. The officers then ran a warrant check; it revealed no warrants, but did show that the defendant was on probation. The first officer told the defendant that she knew he was on probation, but that he did not have any outstanding warrants. She then asked the defendant to "'please stand at the front of [the second officer's] patrol vehicle.'" 245 Or App at 564. A subsequent inventory of the stopped car revealed the defendant's bags; the officers asked for and got the defendant's permission to search those bags and incriminating items were discovered. On appeal, we were called upon to determine whether the defendant had been seized under Article I, section 9, at the time that the officers asked for permission to search the defendant's bags. We concluded that he had been seized by that moment. After stating the principle that "a reasonable person would believe that an officer's actions amounted to * * * [a] show of authority 'if the person knew that he or she was the subject of a criminal investigation,'" *id.* at 565 (quoting *Radtke*, 242 Or App at 239), we noted that the officers had told the defendant that he was on probation and had learned of the fact that the defendant had given them a false name. We thus concluded that a reasonable person in the defendant's position would think that he or she was under investigation, and thus, that his freedom of movement had been significantly restricted. We also noted that the officers did not tell the defendant that he was free to leave but instead directed his movements by "direct[ing]" him to stand at the front of the patrol car. *Id.* at 567.

We acknowledge that an officer's act of directing a person to alter the person's course of travel or to otherwise direct the person's movements may often constitute a "show of authority" that effectuates a seizure, but that is not a *per se* rule of Oregon constitutional law. *See State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005) (officer's acts of stopping his vehicle alongside a defendant and "gesturing for [the] defendant to approach" did not "intrude upon defendant's liberty of movement," because they did not constitute a show of authority involving "conduct significantly beyond that accepted in ordinary social intercourse" (internal quotation marks omitted)); *State v. Dudley*, 245 Or App 301, 306, 263

P3d 1054 (2011), *rev den*, 354 Or 838 (2014) (officer's actions towards a defendant who was a passenger in a car, including asking the defendant to step out of the car, did not amount to a "show of authority"); *State v. Lantzsch*, 244 Or App 330, 260 P3d 662, *rev den*, 351 Or 318 (2011) (similar). Instead, it is critical to examine the officer's directive in the context of the encounter in which it was made. *See Holmes*, 311 Or at 407 ("Encounters may range from friendly exchanges of pleasantries or mutually helpful information to hostile confrontations of armed persons involving arrests, injuries, or even loss of life."). For purposes of assessing whether an officer has conveyed that a person is not free to terminate the encounter or otherwise go about his or her affairs, telling that person to "stay on the curb [because I am investigating you for a crime and I might have to arrest you]" is not the same as saying, "stay on the curb [and I'll come meet you there to continue our conversation at a more convenient locale]," which is not the same as, "stay on the curb [because the traffic signal is out and I have been assigned to safely direct pedestrians through this intersection]."

The trial court found that Dunning's request to stay on the curb was not a "command," and that the "tenor" of the conversation was as defendant described it, *viz.*, "usual" and "casual." Unlike *Zaccone*, the directive to defendant was not given after a police interaction of any length, let alone one in which the officer had conveyed a belief that defendant was under investigation by the time that it was given. Unlike *Johnson*, there was no indication that defendant was attempting to do anything other than voluntarily converse with Dunning at the moment that Dunning directed him to stay on the curb. That is, defendant was not directed to alter the conduct of his affairs in any significant degree. Dunning's request to stay on the curb was a *de minimis* request that, at most, slightly altered the location of an ongoing, casual, and consensual conversation. That does not amount to the type of "show of authority" that the Oregon Constitution requires before a seizure will be found. *See Backstrand*, 354 Or at 401 ("What is required is a reasonable perception that an officer is exercising his or her official authority to restrain."); *State v. Highley*, 354 Or 459, 468, 313 P3d 1068 (2013) ("An officer seizes a person only if the officer's words, manner, or

actions would convey to a reasonable person that the officer is exercising his or her authority to restrict the person's liberty or freedom of movement in a *significant* way—that is, in a way that exceeds ordinary social boundaries." (Emphasis added.)).

Nonetheless, the fact that the officer directed defendant to remain on the curb is one that colors—to some degree—the remainder of the encounter for purposes of the Article I, section 9, analysis. *See, e.g., Hall*, 339 Or at 18 ("The determination whether a person has been 'seized' under Article I, section 9, requires a fact-specific inquiry examining the totality of the circumstances in the particular case."). Defendant characterizes Dunning's questioning and requests to search defendant's bags as conduct that would convey to a reasonable person that Dunning was intentionally restricting defendant's liberty by a show (or shows) of authority. Specifically, defendant reasons that the officers' inquiries and requests—in the face of his assertion that the sea bag contained cans—would have conveyed to a reasonable person that Dunning did not believe defendant's response and, thus, that Dunning was intentionally and significantly restricting the defendant's liberty as part of a criminal investigation.

That argument is foreclosed by the Supreme Court's decision in *Highley*, 354 Or at 459. There, to broadly recount, the defendant was a passenger in a car that a police officer knew was being driven by a man with a suspended license. The driver parked; the defendant, the driver, and one other passenger got out of the car; the officer parked some distance behind the parked car and commenced an investigation of the driver. The officer eventually asked the defendant, who had walked away and then returned, whether he was on probation; he also asked the defendant and the other passenger whether he could look at their identifications. The defendant handed over his license and denied that he was on probation. The officer held defendant's license for no more than one minute and returned it. He then walked to his patrol vehicle to radio that information into dispatch, while the defendant milled about the scene. Dispatch reported that the defendant was not on probation. The officer got out of his patrol car and asked the other passenger whether he would consent to be

searched. A second officer arrived during that search. After finding nothing of interest, the officer turned his attention back to the defendant, who was then either looking into or retrieving something from the trunk of the car, apparently in anticipation of its being towed. The officer approached the defendant, told him that he was correct about not being on probation, and asked if the defendant would consent to a search. The defendant responded by telling the officer that he would empty his pockets. He showed the officer the contents of his right pocket, and then removed a "small, oval-shaped, plastic container" from his left pocket. *Id.* at 464. The officer asked what was in it; the defendant responded, "'[S]ome diamonds.'" *Id.* The officer asked him to open the container. The defendant opened it slightly and cupped his hands so that some of its contents fell out. He then put the container back in his left pocket. The officer again asked of the defendant whether he could look in the container and his left pocket. The defendant eventually pulled it out again in a manner that suggested he was attempting to hide something. After a series of odd movements by the defendant, the second officer observed a small plastic bag containing drugs.

The Supreme Court held that no seizure had occurred before the point that the officers discovered the drugs: "None of [the officer's] actions—the request for identification, the check of defendant's probationary status, and the request for consent to search—individually constituted a seizure. Considered in combination, they were simply acts that occurred sequentially. They did not combine to form a whole greater than the sum of their parts." *Id.* at 473.

*Highley* leaves us no room to conclude other than that defendant was not seized by Dunning's inquiries about his sea bag and his requests to search its contents. As far as a show of authority conveying that "the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs," *Backstrand*, 354 Or at 401-02, it is enough to note that the police conduct condoned as lawful in *Highley*— e.g., a lengthy police investigation with two officers, involving a request for the defendant's identification, a probation check, and numerous requests to search the defendant's person—went considerably beyond what occurred here—a shorter interaction, no request for identification, no probation

check, fewer requests for consent to search, in the context of a "casual" conversation. *Accord Ashbaugh,* 349 Or at 317 (no seizure resulted when—after a "relaxed and nonconfrontational" conversation—an officer asked a defendant whether she had anything illegal in her purse, she said that she did not, and the officer then asked for permission to search her purse (internal quotation marks omitted)); *State v. Kinkade,* 247 Or App 595, 270 P3d 371 (2012) (no seizure resulted when an officer approached a defendant, asked if he could talk, asked if he would agree to be patted down, and then, after the defendant agreed, patted him down). Because we conclude that defendant was not seized prior to the discovery of the marijuana, it follows that defendant was not unlawfully seized.

Affirmed.